FILED
2018 Aug-08 PM 03:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| WESTLAKE FLOORING CO., LLC, ] ] ] **Appellant,** ] ] v. ] ] MICHELLE STAGGS, ] ] **Appellee.** ] | **CIVIL ACTION NO. 5:17-CV-1722-KOB** |

## MEMORANDUM OPINION

Creditor-Appellant Westlake Flooring Co. appeals the Bankruptcy Court's Final Order and Judgment finding that Westlake failed to prove that Debtor-Appellee Michelle Staggs's $152,480.95 debt to it is non-dischargeable. On appeal, Westlake asserts, as it did in its adversary proceeding before the Bankruptcy Court, that 11 U.S.C. § 523(a)(6) excludes Ms. Staggs's debt from dischargeability because it arose from her infliction of a "willful and malicious injury." Westlake Flooring contends that Ms. Staggs, using her status as an officer of her automobile dealership, Alabama Direct, converted or assisted Alabama Direct in converting Westlake's security interest in the proceeds of sold vehicles for her and Alabama Direct's benefit.

The Bankruptcy Court found that Westlake failed to show that Ms. Staggs inflicted the injury about which Westlake complains because Ms. Staggs had insufficient involvement with Alabama Direct's operations to have "actively participated" in the conversion. As a result, the Bankruptcy Court concluded, Ms. Staggs's debt to Westlake did not arise from *her* infliction of a willful and malicious injury and, therefore, did not trigger the exception to discharge under § 523(a)(6).

This court, having considered the parties' arguments, the record on appeal, and the applicable law, concludes that the Bankruptcy Court did not clearly err in finding that Westlake failed to prove by a preponderance of the evidence that Ms. Staggs's $152,480.95 debt arose from her infliction of a willful and malicious injury. Accordingly, this court will AFFIRM the Bankruptcy Court's Final Order and Judgment.

## PROCEDURAL HISTORY

Ms. Staggs filed a Chapter 7 bankruptcy petition on December 21, 2015, in the Bankruptcy Court for the Northern District of Alabama. On May 27, 2016, Westlake Flooring began the instant adversary proceeding seeking denial of discharge under 11 U.S.C. § 523(a)(2), (a)(4), and (a)(6). The Bankruptcy Court tried the matter on May 24 and 25, 2017, and entered a Memorandum Opinion and Judgment in Ms. Staggs's favor on September 22, 2017. Westlake Flooring timely filed its appeal to this court.

## STANDARD OF REVIEW

This court has appellate jurisdiction over the Bankruptcy Court's Final Judgment under 28 U.S.C. § 158(a). On appeal, this court reviews *de novo* legal conclusions. *In re Cox*, 493 F.3d 1336, 1340 n.9 (11th Cir. 2007). This court reviews the Bankruptcy Court's findings of fact for clear error. Fed. R. Bankr. P. 8013. A finding of fact is not clearly erroneous unless "after reviewing all of the evidence" the court is "left with the definite and firm conviction that a mistake has been committed." *In re Int'l Admin. Servs., Inc.*, 408 F.3d 689, 698 (11th Cir. 2005).

Furthermore, the court must narrowly construe all exceptions to Chapter 7 bankruptcy discharge. *See Gleason v. Thaw*, 236 U.S. 558 (1915); *Local Loan Co. v. Hunt*, 292 U.S. 234, 244-45 (1934). As the Supreme Court explained in *Hunt*, "[o]ne of the primary purposes of the

Bankruptcy Act is to relieve the honest debtor from the weight of oppressive indebtedness, and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes . . . The various provisions of the Bankruptcy Act were adopted in light of that view and are to be construed when reasonably possible in harmony with it so as to effectuate the general purpose and policy of the act." *Hunt*, 292 U.S. at 244-45 (internal quotation marks and citations omitted).

## FACTS

*A.  Westlake & Alabama Direct*

Appellant-Creditor Westlake, a "floor-plan financier," advances money to automobile dealerships.[1] Auto dealers use this money to purchase cars at auction or by trade-in. A "floor-planned" vehicle is a vehicle bought with a floor-plan lender's advance funds. A dealer sells a floor-planned vehicle "out of trust" when it sells the vehicle but fails to repay the floor-plan lender's advance.

Appellee-Debtor Michelle Staggs owned an auto dealer incorporated as Alabama Direct Auto, LLC. Alabama Direct operated much like a typical auto dealer, and it engaged Westlake as well as several other financiers to provide floor-plan advances. Westlake provided Alabama Direct with a $500,000 line of credit, and Alabama Direct authorized Westlake to automatically debit any necessary payments on that line of credit from Alabama Direct's checking account. Ms. Staggs personally guaranteed the line of credit with Westlake.

In exchange for granting the line of credit, Westlake took security interests in its floor-planned vehicles, earned interest, and charged certain fees to Alabama Direct while the floor-

---

[1] Westlake does not challenge the Bankruptcy Court's findings as to the background facts or the sequence of events involved in this appeal.

planned vehicles sat on Alabama Direct's lot unsold.  Westlake also kept titles to the floor-planned vehicles until their pay off.

Westlake required Alabama Direct to pay off Westlake's title lien within seven days of a vehicle's sale, or within 24 hours of Alabama Direct's receipt of sale proceeds, whichever event occurred first.  Finally, Westlake required Alabama Direct to attach a $100 "reserve" to each floor-planned vehicle, with that $100 held in trust for Westlake in the event Alabama Direct defaulted on the line of credit.

Westlake Financial Services, a parent or affiliate of Westlake Flooring, ran a similar operation for consumer financing.  Alabama Direct maintained a relationship with Westlake Financial for consumer financing to purchasers of its floor-planned vehicles.  Alabama Direct's agreement with Westlake Financial required it to repurchase a consumer-financing contract *if* the consumer failed to make his or her first payment on the contract.

B.  *Alabama Direct's Sales Operations*

In this appeal, the most critical facts are those involving Ms. Staggs's involvement in Alabama Direct's sales operations, and, more specifically, in Alabama Direct's relationship with Westlake.  Ms. Staggs delegated virtually all of the responsibility for running Alabama Direct to other employees.  Most notably, she retained Wes Staggs, her husband, as general manager.  Indeed, Ms. Staggs appears to have purchased Alabama Direct for the sole purpose of ensuring her husband's continued employment.  Wes Staggs had been Alabama Direct's general manager under the company's previous owner.  As general manager, Wes Staggs operated Alabama Direct on a day-to-day basis.  For example, Wes Staggs purchased and sold automobiles, managed the dealership's employees, and handled issues with customers.

More importantly to this appeal, Wes Staggs "controlled Alabama Direct's relationship with its lenders." (Bankruptcy Opinion at 7). For example, Wes Staggs dealt with "regular audits conducted by floor plan lenders and provid[ed] the primary interaction with them[.]" (*Id.*).

Ms. Staggs, however, occupied an informal position as Alabama Direct's bookkeeper. In that position, Ms. Staggs maintained accounting records, such as the transactions involving the dealership's checking account, transactions using the dealership's credit card with American Express, and the dealership's cash transactions. Ms. Staggs downloaded or logged account data into QuickBooks as necessary. Ms. Staggs also checked Alabama Direct's bank accounts daily for unusual activity. And Ms. Staggs logged vehicle-purchasing activity into software designed to track vehicle inventory. However, Ms. Staggs did not update the database to reconcile that inventory with Alabama Direct's financial transactions. For that reason, Ms. Staggs used the database to track vehicle *purchases*, not vehicle *sales*. (Bankruptcy Opinion at 8).

Typically, Wes Staggs or other Alabama Direct managers notified Ms. Staggs that they had sold a particular vehicle under a specific floor-plan arrangement. (Bankruptcy Opinion at 8). Once notified of a sale, Ms. Staggs made the appropriate payment to the relevant floor-plan lender. Ms. Staggs also indirectly tracked Alabama Direct's sales by inferring that a sale occurred whenever Alabama Direct's checking account received a credit and, having observed such a credit in Alabama Direct's account, she would understand that she generally needed to make a corresponding lien payment to a floor-plan lender.

    C.    *Alabama Direct's Business Dispute With Westlake*

In late 2015, cracks began to form in Alabama Direct and Westlake Financing's business relationship. Alabama Direct—driven by Wes Staggs—believed that Westlake Financing had

5

been improperly demanding that Alabama Direct repurchase consumer-financing plans. However, Wes Staggs never read Westlake Financing's terms. As stated above, under the terms of its contract with Alabama Direct, Westlake Financing indeed had the right to require Alabama Direct to repurchase consumer installment plans under certain conditions.

Undeterred by his ignorance of the contractual language, Wes Staggs insisted on a meeting with Westlake Financing to discuss the issue. After Westlake Financing twice postponed arranged meetings, Wes Staggs resolved to switch Alabama Direct to a different floor-plan lender, with the intention of having the new affiliate purchase Westlake's interests in Alabama Direct's inventory. However, before that changeover occurred, Wes Staggs ceased notifying Ms. Staggs about whether and when to make payments to Westlake for sold cars. Consequently, Alabama Direct ceased making payments to Westlake, in violation of Alabama Direct and Westlake's agreement.

On November 5, 2015, an audit by Westlake representatives revealed that Alabama Direct had sold 27 of its Westlake floor-planned vehicles without repaying Westlake's advance; in industry parlance, Alabama Direct made the sales "out of trust." Wes Staggs testified that he made the decision to stop paying Westlake, and, in total, Alabama Direct failed to pay Westlake for 20 floor-planned vehicles. (Bankruptcy Opinion at 9-10).

For her part, Ms. Staggs testified "that she did not know why the sale[s] of these vehicles were not reported nor why Westlake Flooring was not paid the proceeds for the sale of the vehicles." (Bankruptcy Opinion at 9). After discovering that Alabama Direct had made out-of-trust sales, Westlake did not communicate the issue to Ms. Staggs, the personal guarantor of the line of credit, instead choosing to continue to deal exclusively with Wes Staggs.

In October and November 2015, Ms. Staggs, acting as Alabama Direct's bookkeeper, made two transfers totaling $163,000 to protect Alabama Direct from "unauthorized [automated] debits by floor plan lenders," *i.e.,* Westlake. (Bankruptcy Opinion at 9). Specifically, on October 2, 2015, Ms. Staggs transferred $80,000 from Alabama Direct's checking account to Alabama Direct's savings account. In November 2015, Ms. Staggs transferred another $83,000 from Alabama Direct's checking account to its savings account.

In total in 2015, Alabama Direct made nearly $900,000 in payments to Westlake, but it made no payments to Westlake in November or December of that year. Conversely, in the same months, Alabama Direct made payments of $179,514.55 to NextGear, another floor-plan lender, and $24,323.72 to American Express.

Alabama Direct declared bankruptcy soon thereafter and turned all of its assets—including the remaining portions of the transferred funds—over to the Chapter 7 trustee. Ms. Staggs, who found herself personally liable for many of Alabama Direct's debts because of personal guarantees, also declared bankruptcy. At issue is the dischargeability of Ms. Staggs's $152,480.95 debt to Westlake, a result of Ms. Staggs's personal liability for Westlake's advances to Alabama Direct for the vehicles sold out of trust.

*D. The Bankruptcy Court's Decision*

Westlake began an adversary proceeding against Ms. Staggs in the Bankruptcy Court seeking to deny discharge of Ms. Staggs's debt to Westlake resulting from her personal guarantee of Alabama Direct's line of credit. Westlake argued that, under 11 U.S.C. § 523(a)(6), Ms. Staggs's $152,480.95 debt was non-dischargeable as a result of her and Alabama Direct's sales of vehicles out of trust.

After a trial on the merits, the Bankruptcy Court rejected Westlake's claim of non-dischargeability. Specifically, the court found that Ms. Staggs was not "actively involved in the day-to-day business operations of Alabama Direct." Because she was not "actively involved" in Alabama Direct's operations relevant to the out-of-trust sales, Ms. Staggs's debt did not arise from *her* infliction of a willful and malicious injury. As to the two transfers Ms. Staggs made in late 2015, the Bankruptcy Court found that they were not illegitimate: Alabama Direct used the funds to pay continuing business expenses and Ms. Staggs did not convert the funds for her personal use.

## **DISCUSSION**

On appeal, Westlake argues that the Bankruptcy Court erred by finding that Ms. Staggs's $152,480.95 debt did not arise from her infliction of a willful and malicious injury on Westlake. Specifically, Westlake argues that the Bankruptcy Court overreached in its reading of the applicable case law, improperly imposing a requirement that Ms. Staggs could *only* "actively participate" in her auto dealership's out-of-trust sales *if* she was involved in the regular, "day-to-day" management of Alabama Direct. Asserting that the facts of *Chrysler Credit Corp. v. Rebhan*, 842 F.2d 1257 (11th Cir. 1988), and *Ford Motor Credit Co. v. Owens*, 807 F.2d 1556 (11th Cir. 1987), show that such "day-to-day" management is unnecessary to find that § 523(a)(6) exempts a debt from discharge under these circumstances, Westlake concludes that Ms. Staggs's knowledge of the floor-plan agreement and participation in Alabama Direct's business as its bookkeeper establish that she knew and understood that Alabama Direct was failing to pay Westlake. Along the same lines, Westlake argues that Ms. Staggs calculated the

two transfers from Alabama Direct's checking account to its savings account to prevent Westlake's recovery of its security interest in the sales proceeds of floor-planned cars.[2]

The court disagrees. The Bankruptcy Court correctly distinguished *Owens* and *Rebhan* and did not clearly err in finding that Ms. Staggs's debt did not arise through *her* infliction of a willful and malicious injury. *See In re Kane*, 755 F.3d 1285, 1292 (11th Cir. 2014) (noting that whether the debtor incurred her debt through a willful and malicious injury under § 523(a)(6) is a factual question subject to clear error review on appeal).

Chapter 7 of the Bankruptcy Code provides a "fresh start" to debtors through liquidation of assets, fair distribution of those assets to creditors, and, ultimately, discharge of remaining debt. *See, e.g.*, 11 U.S.C. § 727(a), (b); *Ohio v. Kovacs*, 469 U.S. 274, 278 (1985); *In re Mitchell*, 633 F.3d 1319, 1326 (11th Cir. 2011). However, the Bankruptcy Code only provides those "fresh starts" to "honest but unfortunate debtor[s]." *Kane*, 755 F.3d at 1292. So, § 523 of the Bankruptcy Code exempts from discharge several categories of debt created by a debtor's wrongful conduct.

A debtor cannot discharge a debt arising from "a willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). The key language—and the language at issue in this appeal—is "willful and malicious injury." The terms "willful" and "malicious" modify "injury," so a mere intentional act that *causes* injury is insufficient to trigger § 523(a)(6). *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). Rather, a creditor must show that the *debtor herself acted* with the *intent to injure* the secured party. *Id.* at

---

[2] Westlake also argues that the Bankruptcy Court erred by distinguishing *Owens* and *Rebhan* in favor of *In re Moody*, 277 B.R. 865 (Bankr. S.D. Ga. 2001). The court does not directly address this argument because it finds that the Bankruptcy Court did not clearly err regardless of its decision to analogize this case to *In re Moody*, which is mere persuasive authority.

9

61. Generally, the circumstances in which out-of-trust sales arise suffice to warrant a conclusion that the debt arose from a "willful and malicious" injury. *See Owens*, 807 F.2d at 1559.

In this case, however, the debt at issue arose from out-of-trust sales made by Alabama Direct, and a creditor seeking denial of discharge under § 523(a)(6) must show that the debtor herself—Ms. Staggs—inflicted the willful and malicious injury from which the debt at issue arose. *See* 11 U.S.C. § 523(a)(6); *Kane*, 755 F. 3d at 1293.

However, a debtor like Ms. Staggs does not necessarily insulate herself from denial of discharge simply because she acted on behalf of her corporate entity at the time of her infliction of a willful and malicious injury. *See Owens*, 807 F.2d at 1559. So long as the debtor actively participated in her corporate entity's infliction of a willful and malicious injury, any debt arising out of that injury for which she becomes personally liable can be exempted from discharge under § 523(a)(6). *See id.* Stated another way, the debtor herself inflicts a willful and malicious injury if she actively participates in her corporate entity's out-of-trust sales. *Owens* and *Rebhan*—two Eleventh Circuit cases justifiably discussed at length by the Bankruptcy Court and the parties— illustrate circumstances that permit a court to conclude a debtor actively participated in her auto dealership's out-of-trust sales to the degree warranting denial of discharge under § 523(a)(6).

In both *Owens* and *Rebhan*, an auto dealership failed to remit proceeds from floor-planned vehicles back to the floor-plan lender; that is, the dealerships made out-of-trust sales, inflicting on their floor-plan lender a willful and malicious injury. *Owens*, 807 F.2d at 1557; *Rebhan*, 842 F.2d at 1260-61. And, in both *Owens* and *Rebhan*, the debtors—who each owned the dealerships that had made the out-of-trust sales—personally guaranteed the floor-plan lenders' advances to their dealerships. *Owens*, 807 F.2d at 1557; *Rebhan*, 842 F.2d at 1260-61. The automobile dealerships and the debtors declared bankruptcy, leaving unpaid the floor-plan

lenders' monetary advances. *Owens*, 807 F.2d at 1557; *Rebhan*, 842 F.2d at 1260-61. The floor-plan lenders thereafter sought denial of the debtor's discharge under § 523(a)(6), contending that the debtors themselves inflicted a willful and malicious injury alongside their auto dealerships. *Owens*, 807 F.2d at 1557; *Rebhan*, 842 F.2d at 1260-61.

In *Owens*, the Eleventh Circuit held that the debtor's "active participation" in his dealership's conversion of the floor-plan lender's collateral rendered his personal debt to the floor-plan lender non-dischargeable under § 523(a)(6). 807 F.2d at 1559-60. Several key facts supported the Eleventh Circuit's ruling: (1) the floor-plan lending agreement required the dealership to hold all sales proceeds in trust; (2) the debtor testified that *he sold* the vehicles out of trust and that *he knew* his dealership held out-of-trust positions; and (3) the debtor made an unrecorded transfer of $100,000 from the account of the out-of-trust dealership to the account of another dealership that he owned. *See id.* at 1557.

Similarly, in *Rebhan*, the Eleventh Circuit held that the debtor's "substantial participation in the management" of his dealership sufficed among the other circumstances to support a finding that he participated in his dealership's conversion of the floor-plan lender's collateral. *See* 842 F.2d at 1261-62. In concluding that a bankruptcy court did not clearly err in finding against the debtor, the Eleventh Circuit cited the facts that (1) the debtor, in a verified complaint, admitted to substantially participating in the dealership's operations; (2) the debtor made "repeated" phone calls to the dealership to discuss the dealership's operations; (3) the debtor visited the dealership to assist the dealership's operations; and (4) the debtor "actually received some of the converted sales proceeds" through a surreptitious and extraordinary disbursement. *Id.* at 1260, 1262-64.

11

In both *Owens* and *Rebhan*, the Eleventh Circuit—applying the clear error standard of review—affirmed the lower courts' findings that the debts at issue were non-dischargeable by virtue of the debtor's infliction of a willful and malicious injury.

Here, the Bankruptcy Court correctly applied *Owens*'s and *Rebhan*'s *standards* and did not clearly err by finding that Westlake failed to prove that Ms. Staggs's debt arose from her infliction of a willful and malicious injury on Westlake. As the Bankruptcy Court found, neither *Owens*'s nor *Rebhan*'s *result* applies because Wes Staggs managed all the operations of Alabama Direct relevant to whether the dealership remitted sales proceeds of floor-planned vehicles to the relevant floor-plan lender. Ms. Staggs, on the other hand, was not involved with the dealership's decision to cease payments to Westlake nor with deciding when the dealership would remit payment. Given these facts, the court cannot say that the Bankruptcy Court clearly erred by finding that Ms. Staggs did not actively participate in Alabama Direct's out-of-trust sales. And because Ms. Staggs did not actively participate in the out-of-trust sales, the Bankruptcy Court likewise had no reason to find that Ms. Staggs's debt to Westlake arose through *her* infliction of a "willful and malicious" injury.

Westlake asserts that the Bankruptcy Court based its conclusion on a misapplication of the "active participation" standard set forth in *Owens* and *Rebhan* and improperly distinguished the facts of those cases from the facts at bar. The court agrees with Westlake that regular, "day-to-day" contact or involvement with a business's management is not the *sine qua non* of active participation. But the Bankruptcy Court did not apply the standard so rigidly, and, as the facts of *Rebhan* show, the *amount* of the debtor's contact with his dealership is far less relevant than the *nature* of that contact. *See Rebhan*, 842 F.2d at 1262-64.

For example, in *Rebhan*, the facts revealed that the debtor participated in his dealership's sales operations around the same time as the out-of-trust sales and—through surreptitious means—he personally received an extraordinary payout directly from the proceeds of the out-of-trust sales. *Id*. Those facts supported the court's finding that the debtor participated in the out-of-trust sales, and, therefore, inflicted a willful and malicious injury.

By contrast, the Bankruptcy Court found here that Ms. Staggs's decision-making at Alabama Direct *never* involved issues of when and whether to pay Westlake. Although Westlake urges this court to disregard Ms. Staggs's "self-serving unsubstantiated testimony," the Bankruptcy Court credited Ms. Staggs's explanation at trial and the facts surrounding the sales do not undercut the Bankruptcy Court's finding on this point. *See Kane*, 755 F.3d at 1288 (observing that "when we examine facts adduced at trial, generally we will not disturb a bankruptcy court's credibility determinations").

Westlake, for example, asserts that Ms. Staggs's access to Alabama Direct's checking account and her corresponding ability to identify when Alabama Direct sold a car necessarily undercut the Bankruptcy Court's decision to credit Ms. Staggs's testimony that she did not know about the out-of-trust sales. But two points, one factual and one legal, defeat Westlake's argument.

First, although Ms. Staggs could infer *when* Alabama Direct made a sale, she would not necessarily know *which* car in particular Alabama Direct had sold, and, therefore, she would not know *which* floor-plan lender Alabama Direct needed to pay. Rather, as Ms. Staggs testified, she relied on Wes Staggs to identify the proper floor-plan lender. Tellingly, even after it learned that Alabama Direct had sold vehicles out of trust, Westlake continued to work with Alabama Direct through Wes Staggs and did not notify Ms. Staggs about the issue. Beyond conclusory

assertions doubting the candor of Ms. Staggs's and Wes Staggs's testimony, Westlake fails to explain how Ms. Staggs would otherwise know which floor-plan lender she needed to pay.

Second, § 523(a)(6) does not require a debtor to continuously track her company's debts and determine when they need to be paid to guarantee dischargeability. A debtor's negligence or recklessness in operating her business does not amount to infliction of a willful and malicious injury. *See In re Monson*, 661 Fed. Appx. 675, 685 (11th Cir. 2016) (collecting cases rejecting argument that negligent debtor can act with malice); *see also Rebhan*, 842 F.2d at 1263 (adopting line of cases stating that the "willfulness" prong of "willful and malicious" injury cannot be established by the mere reckless disregard for the consequences of an action or inaction). Undoubtedly, Ms. Staggs *could* have—and given Alabama Direct's failure, perhaps *should* have—maintained better oversight of the dealership's operations. But, *could* and *should* are terms of negligence or recklessness, and neither negligently—nor recklessly—caused injuries satisfy § 523(a)(6)'s standard.

Finally, Westlake asserts that Ms. Staggs's transfers of funds from Alabama Direct's checking account to its savings account established that she actively participated in Alabama Direct's conversion of Westlake's collateral. On this point, Westlake contends that "the act of doing *anything* with the proceeds" of a creditor's collateral other than paying off the creditor is an intentional act the purpose of which is to cause injury. (Doc. 5 at 35) (emphasis added).

To be sure, Ms. Staggs admitted that she transferred money from Alabama Direct's checking account to prevent debits from Westlake. But, even assuming that Ms. Staggs converted funds by performing the transfers,[3] "innocent or technical" conversions and

---

[3] The court questions whether the transfers constituted "conversions" because Alabama Direct's agreement with Westlake Flooring only required Alabama Direct to hold $100 in reserve for each floor-planned vehicle and did not prohibit Alabama Direct's comingling of sales proceeds and operating funds.

"unauthorized assumption[s] of dominion without willfulness or malice" do not warrant the harsh sanction of non-dischargeability. *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 331-33 (1934) ("[A] willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without willfulness or malice . . . . The discharge will prevail as against a showing of conversion without aggravated features.") (Cardozo, J.); *see also Kawaahau*, 523 U.S. at 63-64 (reaffirming *Davis*).

And here, Ms. Staggs testified that she meant to protect Alabama Direct from *unauthorized* debits. Given the Bankruptcy Court's decision to credit Ms. Staggs's testimony—a credibility finding that this court sees no reason to disturb—Ms. Staggs had, at worst, an honest but mistaken belief that she was entitled to exercise dominion over the funds she transferred. For that reason, the court cannot say that, by making the two transfers at issue in this case, Ms. Staggs acted with the intent to injure necessary to render her debt non-dischargeable under § 523(a)(6).

## CONCLUSION

The Bankruptcy Court did not clearly err by finding that Westlake failed to show that Ms. Staggs's debt to Westlake arose from her infliction of a malicious and willful injury. The Bankruptcy Court's factual findings support its conclusion that Ms. Staggs had insufficient involvement in Alabama Direct's out-of-trust sales to have inflicted the injury herself. This court will thus AFFIRM the Bankruptcy Court's judgment denying Westlake's claim under § 523(a)(6) for denial of discharge of Ms. Staggs's $152,480.95 debt.

**DONE** and **ORDERED** this 8th day of August, 2018.

_____
**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE